Good afternoon, your honors. Issues presented in this case is whether adverse credibility findings are supported by substantial evidence. Immigration judge has cited three different reasons for his findings. I would like to take them one by one. First, I commented on I.J. stated in his decision that the petitioner is acting and she's attempting to put a show in order to influence the court. However, this is a general statement which is not supported by any specific examples. It's a pretty general statement. It's not uncommon for asylum seekers when they show emotions during their testimony. And in this particular case, petitioner has shown emotions. She's a human being and any human being who has suffered similar traumatic incidents would show. She's not a, it's really human nature when people just cry, which she did here. I.J., at least on three different occasions, noted that she showed emotions and she, he recessed, called a recess in this case. And even the petitioner apologized to the court on three different occasions. One is on page 65, line 13, where she said, I'm sorry that I'm crying in this position. Second one is on page 69, line 16. I again apologized for my, for my discondition. And the third one, I.J. Monish, the petitioner, that's on page 73, starting with line 18. I quote, you know I, you have shown a lot of emotion, but I would appreciate if you can compose yourself so we can, you can finish your testimony today. I would submit, Your Honors, that I.J.'s finding about demeanor is not supported by substantial evidence. Well, if we set that aside, there were some other evidences that might support incredibility. Thinking about the authenticity of the letter and those were the things that maybe were more concerning to me. Yes, Your Honor. I will definitely come, come and address those issues as well. And the second issue I would like to address about, which is pretty minor, as to when petitioner joined the Labor Party, 1987 versus 1985. It's a very minor inconsistency. We can see there's inconsistency, but it's very minor. It doesn't go to the heart of the matter. What's minor? I'm sorry. I'm sorry, Your Honor. Which distinction are we now discussing? About. When he joined the Labor Party. When he joined the Labor Party, Your Honor. Right. And, you know, that's my, I submit that's minor. The questions, the more significant questions are the internal documentary issues, such as the fact that there appears to be some, the letter seems to be both typewritten and photocopied and that it talks, one of the letters talks about having events that hadn't yet occurred, according to her testimony. Your Honor, you know, these three documents were sent to the Fenske Lab, and even the examiner has stated, and that's page 99, Your Honors, it was not possible to determine the authenticity of Exhibits K-1, K-2, and K-3 by comparison. And on number four, Your Honor, even the examiner has stated it is suspicious that someone would mistakenly write 1999 in 1994. So I submit that these findings are not conclusive and should not be used. But it is conclusive that the date was overwritten, right? But, Your Honors, Your Honor. And it is conclusive, as I understand it, that the letter contains both photocopied and original typewritten text, right? Right, Your Honor. That's true, but Petitioner. It's conclusive that the date of the event was apparently after this March 27, 1994. That's correct, Your Honor, yes. Your Honor, Petitioner testified that she brought this document, which is Exhibit 5, letter from the Labor Party, with her from Fiji, and the document remained with her all the time, and she is not aware of any changes being made on the document. And secondly, Your Honor, so far ---- Didn't she say that the event that's recounted in the last two paragraphs of this letter occurred after March 27, 1994? She testified, Your Honor, that the event took place in April of 1994, and the letter allegedly was issued on March 27, 1994. Did she explain that? She ---- You know, that's what her testimony is, but I asked the court to view that part of the testimony in Petitioner's emotional state of mind. She broke down. The record is evidently clear that she broke again and again. You're saying it may not have happened in April. She could be wrong about that date. She may be wrong, Your Honor. That's possible. And, Your Honor, I may ask the court to look at that particular section where she testified. You know, that's on page AR-89. Line 17, Your Honor, it was response to trial counsel's question. I think it was in April. What I tried to remember the dates. I am confused. It is very difficult for me to remember those dates. So your confusion is possibility and given her state of mind during her testimony in the court. The record is evidently clear, Your Honor, that she broke down again and again. There were approximately three occasions when court called for recess. And, Your Honor, the other issue which the I.J. used for adverse credibility finding is how she got the passport. Petitioner explained that she wasn't hiding from April 1994 through November 1994. But she never said that she was hiding all the time. She testified that she was coming out when she had something important to do. So, Your Honor, I submit that this petitioner's testimony was direct, consistent, and plausible on all the material aspects of her claim. It got reviewed in light of her state of mind, which was very problematic, and it is not uncommon when asylum seekers broke down during their testimony. This is exactly what happened in this particular claim. And I submit rest with that, Your Honor. Thank you very much. Thank you. May it please the Court. My name is Rob McAuliffe. I'm here today on behalf of the respondent, the Attorney General. This case should be affirmed because there's substantial evidence in the record that fully supports the I.J.'s adverse credibility finding. In addition, the evidence in the record clearly does not compel a contrary result. There are many reasons for the finding in this case, including what was mentioned just a minute ago, demeanor. Let me start with demeanor. There's demeanor. There's inconsistencies. There's lack of integrity in the documents. Let me start with demeanor. Contrary to counsel's representation, there is a specific cogent reason included in the I.J.'s opinion about demeanor. He didn't just say she was acting. He said she was acting. He said he found that she testified in a very emotional manner in response to simple questions or in response to nontraumatic events. And we would submit that's akin to an I.J. finding, for example, if someone was jumping in their seat or if someone was squirming or if someone was uncomfortable or defensive. Those types of things are cogent reasons for a demeanor finding. Here we have a cogent reason, and that is that she testified very emotionally to simple questions and nontraumatic events, which the I.J. cited. Well, it's really hard when you're not there to see it to know exactly what transpired. It doesn't matter what they're asked. As a lawyer, I once in a while had a witness on the stand who was upset by the simplest of questions. So, you know, this part of it is a little bit difficult for us to evaluate, I think. And that may be in part why the standard is very high. I think this circuit has called it special credence to a finding of demeanor, lack of demeanor credibility. And that has to do with the fact that it's the I.J. who is present who can observe these what are called nonverbal... That's all we have to go on, and I think... But it's not all we have to go on. That is absolutely not all we have to go on. That's the first point in the I.J.'s opinion. That's the first point here. There are numerous inconsistencies. I think we've talked about a few of them. But I'd just like to go over quickly what I've seen in the record. One, she basically is testifying about three incidents. One in 1987, one in 1994, and an incident at a temple. To start out, her application for asylum only talked about one incident when the Army came to her home. It wasn't dated in the application. However, there was a mention of her son being present. And we do know that her son was born in 1988. So from those facts, we know that this incident involving the Army could not have been in 1987 despite the fact that she testified at the I.J. hearing that there was an event in 1987 as well as in 1994. She said with regard to the 1987 incident that at one point in her testimony she could not recall what happened when the Army came. And at another point in her testimony, she then said that when they came, they threatened her husband, they showed him a gun, they threatened my son, and they beat me. Again, she's saying that in the context of the 1987 incident. We know her son wasn't born then, so there's a glaring inconsistency between whether her son was there or not, which she testified to. She also testified in the application, she said nothing about the Army burning down her house. In her testimony before the I.J., she said that that occurred. She also said that with regard to the 1987 incident, she testified that she went into the jungle alone after this incident, and that was because her husband had gone to the United States. That's in direct contradiction to what she testified earlier in that transcript, that her husband was present at this first incident. So there are clear inconsistencies in the testimony with regard to the 1987 incident. The second incident she talks about is the 1994 incident. And again, she uses the same language. She says the Army came to her house, they threatened her husband, and they showed him a gun. She used that same language for that episode. She also testified that her husband left Fiji in 1988 and came to the United States. There's no explanation for how, if her husband left Fiji in 1988, how he was present in 1994 when she claims the Army came and showed him a gun and threatened him. The other main incident she talks about is an incident at a temple. And she's... There are inconsistencies in connection with that as well. At one point, she testified it happened in 1994. At another point, she testified it happened in August of 1993. She testified that she went to the temple with her husband. Again, whether it's 1993 or 1994, there's no explanation for how she'd have gone to the temple with her husband if he left Fiji. Was she asked about those? Pardon me? Was she asked to explain the absence of her... the presence of her husband when he's supposed to have already left? I mean, there's an easy explanation. He could have come back. No, there's no explanation. I don't believe she was asked. She asked. I don't believe she was asked. Well, there's an obvious explanation. He could have left and come back. There's nothing in the record one way or the other on that. It just seemed very persuasive. Okay. The final set of inconsistencies has to do with the Labor Party, and I believe that was mentioned a minute ago. And she testified she became a member in 1987. The document she submitted is inconsistent with that because it says she became a member in 1985. The letter also has, as Your Honor pointed out, the discrepancy in it between the typewritten and the photocopied text. That's the letter purportedly from the party showing when she became a member. In addition, the letter... It's sort of odd, though, because it would make sense to have this sort of partly typed and partly photocopied section if you were adding details to something that was generic. But in fact, the rest of the letter is fairly specific. So what would be the explanation for doing it this way? Well, there's nothing in the record that indicates one way or the other why that is. And I believe that the I.J. simply found that inconsistency and that that he found supported his ultimate adverse credibility ruling. But I will point out there is another inconsistency in the letter in that the letter says, I think in the first paragraph, that she was a member of the party and she organized committee meetings. She testified to what she did for the party. And what she testified to is she said she distributed leaflets and she attended vote countings and lectures. She never testified that she organized committee meetings. So there's an additional inconsistency between the letter that she's relying upon and her testimony with regard to the party. In short, we would say that there is substantial evidence to support the I.J.'s finding of adverse credibility, including these inconsistencies in the incidents, including the demeanor finding. And in addition, there are the differences between her application and the application for asylum and her testimony. As I mentioned a minute ago, she only refers to one incident at her home in the application, whereas at the I.J. she mentions two. In her application for asylum, she said that she could not get a medical report, that she could never obtain a medical report because doctors would not treat her, and yet she submitted a letter from a doctor. That's another inconsistency between those two. In her application, she did not say anything about the Army beating her husband, yet in the testimony at the I.J. she said that they beat her husband in 1987 and 1994. There are also additional discrepancies and inconsistencies that support the I.J.'s finding. We've talked about the March 94 letter from the party, but there is the police report, which Your Honor pointed out had the backdating problem that is going from 1998 back to 1994. But in addition to the police report, the police report talks about a break-in and stolen property. When you look at the police report itself, it sounds like vandalism or a break-in. In her testimony, she did not mention anything about a break-in at her home and she did not mention anything about stolen property. What she said in her testimony was that the Army came and persecuted her. That's inconsistent with what's in that police report. One final inconsistency is that with regard to the doctor letter, the third document she relies upon, and that is that she testified that she could not get medical help and the doctors were afraid to treat her and that one doctor had his surgery burned. Well, she submitted a letter from this doctor, and I don't remember his name, but the letter's in the record. It's an April 94 letter and the doctor reports to the police that he treated her and there's nothing in that letter that says anything about his surgery being burned. So, again, there's another inconsistency there. So, in total, the case is really... In the record, there is substantial evidence to support the finding of adverse credibility and there's clearly not compelling evidence by which a reasonable mind would have to be compelled to come out the opposite way. And we believe because of those factors that this Court should affirm. Thank you. Thank you very much. We'll just take a few follow-up questions. You know, I.J. did not use, for example, that why she produced a doctor's letter when she testified that the doctor didn't treat her or the doctor's clinic was burned.   or the doctor's clinic was burned. as a basis for adverse credibility finding. And the same is true with the petitioner's asylum application. Neither I.J. nor the trial counsel pointed out that how come her asylum application does not have all these events listed. There's nothing in the record, Your Honour, which shows that anybody asked him to, confronted her to the omissions. Nobody did, Your Honour. And same is true with the police report. She was not confronted. She was not given the opportunity to explain. So these cannot be made basis of adverse credibility finding. So I submit, Your Honour, that her testimony should be given full weight and she testified in a candid manner. Thank you very much, Your Honour. Thank you. Thank counsel for their arguments. The case of Chan v. Ashcroft is submitted and we go to the last case of the day, which is Cadet v. Ashcroft.
judges: B. Fletcher, Leavy, Berzon